**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | | |
|---|---|---|
| ATMOS FINANCIAL, PBC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:26-cv-1557 |
| | ) | |
| CLIMATE FIRST BANCORP, | ) | |
| INC.; CLIMATE FIRST BANK; | ) | |
| ONEETHOS, INC.; | ) | |
| MARCIO DeOLIVEIRA; and | ) | |
| KENNETH LaROE, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## COMPLAINT

## NATURE OF THE ACTION

1.     Atmos Financial, PBC ("Atmos") is a small, innovative financial-technology company that built a proprietary platform for connecting solar borrowers and installers with regulated financial institutions seeking to fund climate-positive consumer loans. In a technology-intensive and highly competitive market, Atmos's platform, its installer-management portal, and its specialized operating know-how are the core of its business and its principal competitive advantage.

2.     Climate First Bank and its senior executives gained access to that technology by presenting themselves as Atmos's investors and prospective banking

1

partner. Climate First Bank's founder and CEO, Kenneth LaRoe, proposed that the Bank avoid the cost and difficulty of building its own solar-lending platform and instead build its program on top of Atmos. Climate First Bank, LaRoe, and an entity managed by Jared Meyers invested in Atmos on that premise, and Climate First Bank's Chief Technology Officer, Marcio deOliveira, worked directly with Atmos to define the parties' technical integration.

3.     Atmos trusted them. Atmos expressly communicated and made clear to Defendants that the nonpublic technology and business information it would share was proprietary and confidential, was being provided only to evaluate and implement the proposed business arrangement, and was not authorized for disclosure or use outside that arrangement. In reliance on Defendants' contrary representations, Atmos disclosed the nonpublic diagrams, workflows, installer-management portal design, pricing, vendor information, and related materials that made its platform work.

4.     The known facts support the reasonable inference that Defendants' represented purpose was false. After soliciting Atmos's confidential technology and additional business information for the Climate First Bank-specific minimum viable product and a stated fintech-support "business plan," Defendants used the access they obtained through the proposed arrangement to develop and market a competing

2

OneEthos offering. They never disclosed that competitive purpose or sought Atmos's permission to use its information outside the contemplated arrangement.

5. OneEthos now markets lending technology to the same specialized and finite universe of banks, credit unions, green banks, and other mission-aligned institutions that constitute Atmos's customers and prospects. Atmos first received warnings in May 2026 that OneEthos was pitching an installer-management portal to Atmos's prospective and existing customers. The CEO of an Atmos customer provided further details that gave Atmos its most serious and significant information to date indicating that Defendants had taken and were using Atmos's crown-jewel technology.

6. Atmos does not yet have access to Defendants' internal development records, source materials, or communications; those facts are within Defendants' control. But the known sequence supports the inference of misappropriation: Climate First Bank proposed using Atmos's platform rather than undertaking the cost and difficulty of building its own program; invested and used the proposed arrangement to obtain Atmos's confidential technology for a specifically represented purpose; placed the executive who solicited and received that information in charge of OneEthos; and then pitched Atmos's customers materially corresponding functionality.

3

7.    Atmos brings this action to stop Defendants from exploiting the technology and commercial advantage they obtained through deception, and to recover the value they wrongfully took from a small company that trusted its investor and proposed banking partner.

## THE PARTIES

8.    Plaintiff Atmos Financial, PBC ("Atmos") is a Delaware public benefit corporation with its principal place of business at 350 California Street, Suite 400, San Francisco, California 94104.

9.    Defendant Climate First Bank, and its holding company Climate First Bancorp, Inc. (together, "CFB"), are, respectively, a Florida-based bank and bank holding company. Climate First Bank is headquartered in St. Petersburg, Florida and Climate First Bancorp, Inc. is headquartered in Winter Park, Florida.

10.    Defendant OneEthos, Inc. ("OneEthos") is CFB's financial-technology unit or subsidiary, organized under Florida law, which develops and markets lending technology to financial institutions. OneEthos is headquartered in Winter Park, Florida.

11.    Defendant Marcio deOliveira is an individual who at all relevant times served as CFB's Chief Technology Officer, became Atmos's primary technical contact at CFB, defined the parties' technical scope, solicited and received Atmos's

4

confidential technology and information, and now leads OneEthos as its chief executive.

12. Defendant Kenneth LaRoe is an individual who is CFB's founder, CEO, and chair. LaRoe made the March 2021 proposal that CFB build its solar-lending program on top of Atmos, communicated the partnership premise on which Atmos relied, and personally invested in Atmos by signing a $25,000 Simple Agreement for Future Equity ("SAFE") on July 5, 2021.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Atmos asserts a claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b), and the trade secret at issue is related to products and services used in, and intended for use in, interstate commerce. The Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367 because they form part of the same case or controversy.

14. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1332 because the parties are completely diverse and the damages suffered by Plaintiff exceed $75,000 exclusive of interests, costs and attorneys' fees.

15. This Court has personal jurisdiction over Defendants, and venue is proper under 28 U.S.C. § 1391, because Defendants reside in and maintain their

principal places of business in this District, and a substantial part of the events giving rise to these claims occurred here.

## FACTUAL ALLEGATIONS

### A. Atmos and the Specialized Market for Climate Lending Technology

16.     Atmos is an innovative financial-technology company founded to expand access to climate-positive lending. It competes in a market that combines software development, consumer lending, regulated-bank integration, and green technology operations. In that market, Atmos developed a technology-enabled platform that connects borrowers, solar installers, and financial institutions and enables lenders to compete to fund consumer solar loans.

17.     Atmos's platform is not a website or a referral service. Atmos developed an integrated operating model and proprietary technology for onboarding and managing solar installers, pre-qualifying borrowers, routing loan opportunities, applying lender-specific requirements, originating and documenting loans, and placing originated loans onto the balance sheets of regulated financial institutions. Atmos's technology allows a participating lender to enter and compete in this specialized market without independently building the entire origination and installer-management infrastructure.

18.     Atmos's competitive advantage lies not in any single, publicly visible loan term, but in the integrated structure and implementation of its platform – how

its components work together as a functioning commercial system. Beginning in 2020, Atmos developed a proprietary consumer lending structure and the technology to implement it, including, but not limited to: the decisioning and pre-qualification logic underlying its loans; the manner in which its platform operationalizes a staged, two-phase disbursement; the mechanism by which receipt of the federal investment tax credit ("ITC") triggered re-amortization of a loan carrying a multi-month borrower no-payment period; the direct-to-consumer pre-qualification flow; and the manner in which solar-installer onboarding, approval, and management are integrated into loan origination through a standalone installer-management portal.

19.    Atmos developed this integrated system through substantial investment, technical development, and practical experience in the solar-lending market, and its value derives from the integration of these elements, not from any element in isolation.

20.    This technology derives independent economic value from not being generally known to, or readily ascertainable by, competitors. The architecture, implementation, integration, workflows, and decisioning methods underlying Atmos's platform, and the nonpublic materials describing them, are not generally known or readily ascertainable, even where individual customer-facing loan terms may be visible to borrowers. Atmos protects this information through reasonable measures, including by executing non-disclosure and invention-assignment

agreements with employees and contractors and setting need-to-know access restrictions on sensitive information, securing it with password protection and access controls, and following information security best practices set by a Chief Technology Officer with a security background.

21. The market for climate-focused consumer lending is specialized and finite. Atmos and OneEthos pursue the same relatively limited universe of banks, credit unions, green banks, and other institutions seeking technology and infrastructure for solar and climate lending. Access to Atmos's model and methods therefore gives a competitor an immediate advantage in competing for the very customers and prospects Atmos developed its platform to serve.

## B. Defendants Induced Atmos to Enter the Proposed Arrangement and Solicited Its Information

22. On or about March 18, 2021, CFB's founder and CEO, Kenneth LaRoe, proposed that CFB avoid the cost and difficulty of building its own solar-lending program and instead "truly partner" with Atmos and "just use" Atmos's product. LaRoe explained that CFB could not make the residential-solar program profitable without scale and did not know when CFB would achieve that scale. His proposal represented that CFB sought to build its program on Atmos's platform, not obtain Atmos's internal technology to develop and market a competing offering.

23. Shortly thereafter, Atmos and CFB executed a memorandum of understanding ("MOU") documenting a specifically defined proposed commercial

8

arrangement. Among other things, Atmos would source climate-aligned deposits and climate-positive loan assets for CFB and provide fee-based servicing, and CFB would pay Atmos fees. The MOU supplied the commercial framework within which Defendants requested Atmos's nonpublic information.

24.    Between July and October 2021, CFB and its principals invested in Atmos through SAFEs on that premise: LaRoe invested $25,000 on July 5, 2021; Florida for Good, LLC, managed by Jared Meyers, invested $25,000 on July 26, 2021; and CFB invested $50,000 on October 26, 2021. Their status as investors and prospective commercial partners gave them trusted access to Atmos's founders, technology, operating methods, and business information.

25.    The parties then defined a CFB-specific minimum viable product ("MVP") allocating responsibilities between them. On or about July 27, 2021, deOliveira circulated a proposed MVP scope assigning Atmos responsibility for contractor approval, lead generation, pre-qualification using CFB's parameters, and API submission. On or about July 29, 2021, Atmos confirmed agreement with the initial MVP and explained that it would pre-qualify potential loans using its layered algorithms and deliver loans satisfying CFB's criteria.

26.    On October 3, 2021, deOliveira reaffirmed that CFB intended to "partner with fintech companies," offer values-aligned products and services, and proceed with the proposed MVP. He represented that CFB was moving as quickly

9

as possible to remove regulatory obstacles preventing the partnership from moving forward.

27.     When Atmos later sought an update concerning items needed to finalize the arrangement, CFB did not say it had abandoned the proposed relationship or intended to compete with Atmos. Instead, on February 22, 2022, LaRoe attributed the delays to federal regulators and the need to submit another revised business plan, reinforcing the representation that regulatory issues—not a concealed competing project – were delaying implementation.

28.     On or about March 21, 2022, deOliveira solicited still more nonpublic information, including Atmos's banking-as-a-service pricing, vendor comparisons, cost structures, and security guidance, representing that he was preparing a "business plan" for a program under which CFB wanted to become the "bank of choice for mission-aligned Fintechs" like Atmos. CFB and deOliveira represented that they were requesting and receiving Atmos's information to evaluate and implement the proposed arrangement, including the CFB-specific MVP and the stated fintech business plan, and did not disclose any intention to use the information to develop or market a competing offering.

## C. Atmos Expressly Communicated the Confidential and Limited Purpose of Its Disclosures

29.     Atmos communicated and made clear to Defendants that the technology and business information Atmos was sharing was proprietary and

confidential, was being provided only for purposes of evaluating or implementing the proposed business arrangement, and was not to be disclosed, shared, or used outside that arrangement.

30.    LaRoe had direct notice of Atmos's proprietary technology even before the 2021 technical disclosures. In 2020, while LaRoe was discussing a possible acquisition of Atmos, Atmos sent him a process overview diagram for a proposed deposit partnership. The document expressly stated that Atmos connected customers through "an engaging UI/UX, **proprietary** technology and deep industry relationships." (emphasis added).

31.    Atmos again expressly protected that technology in March 2021. When LaRoe asked for permission to have CFB's public-relations firm publicize the parties' MOU and collaboration, Atmos's CEO asked LaRoe to provide the proposed statement before circulation so Atmos could ensure that it was accurate and "doesn't give away any of our secret sauce." LaRoe agreed: "will do." These communications, among others, directly informed LaRoe – and through him, CFB – that Atmos possessed proprietary nonpublic technology relating to the proposed arrangement, expected it to remain confidential, and reserved control over its disclosure.

32.    Throughout their interactions, Atmos repeatedly made clear that its nonpublic diagrams, workflows, installer-management design, pricing, vendor

11

information, cost information, security guidance, and related materials were proprietary and were being furnished only for the contemplated arrangement. Atmos provided those materials in response to specific requests by CFB's CEO, CTO, and deal team and in the context of the MOU, CFB's investment, the CFB-specific MVP, and CFB's stated business-planning process, not as an unrestricted transfer of technology or general business ideas.

33.    CFB and its executives understood that the information was not being provided for unrestricted use or to develop a competing offering. The requested materials were nonpublic, detailed, and customized for CFB; they were supplied only to the CFB personnel assigned to the proposed arrangement; and they had no purpose in the parties' dealings other than evaluating, designing, and implementing that arrangement. CFB, LaRoe, and deOliveira – sophisticated participants acting through a regulated bank's CEO and CTO – knew that Atmos would not provide a prospective competitor with its internal architecture, workflows, economics, vendor intelligence, and installer-management design for unrestricted competitive use.

34.    The nature of the information independently made its confidential character and limited purpose apparent. Atmos did not provide a generic product brochure, publicly visible loan terms, or an ordinary sales presentation. It provided internal process diagrams, decisioning and pre-qualification flows, CFB-specific integration workflows, installer-management functionality, disbursement processes,

12

vendor analyses, pricing, costs, and the manner in which those components worked together as a functioning system. Defendants knew or had reason to know that this information constituted Atmos's proprietary business information and trade secrets.

35.    Atmos itself treated the information as confidential. It did not publish its process diagrams, internal architecture, decisioning logic, vendor analyses, cost information, or integrated workflows. Within Atmos, it restricted access to employees and contractors who needed the information, required confidentiality and invention-assignment agreements from those personnel, maintained password and access controls, and followed information-security practices overseen by a chief technology officer with a security background. Atmos did not authorize CFB, its personnel, or any affiliated entity to use the information outside the proposed arrangement.

**D. In Reliance on Defendants' Representations and the Limited-Purpose Understanding, Atmos Disclosed Its Crown-Jewel Technology**

36.    In reliance on LaRoe's proposal, the MOU, CFB's investment, the agreed MVP, and Defendants' representations concerning the purpose and limited use of the information, Atmos made its initial technical disclosures in July 2021. On or about July 23, 2021, an Atmos co-founder provided CFB a detailed Scope of Work mapping Atmos's platform across an initial MVP and a subsequent full-solution phase, including contractor approval, lead generation, pre-qualification

mechanics, approval workflows, loan documentation, two-phase contractor disbursement, and servicing customized for CFB.

37. In reliance on Defendants' continuing representations that the proposed arrangement remained under development and was delayed by regulatory issues, Atmos provided additional requested materials. On or about April 4, 2022, Atmos sent CFB's leadership its pre-qualification lending-flow diagram and direct-to-consumer pre-qualification flow, describing how borrowers were evaluated, pre-qualified, routed, and submitted for approval.

38. CFB and deOliveira continued engaging Atmos concerning the proposed relationship through February 2023. During this period, Atmos demonstrated its marketplace system, the software Atmos built and used to evaluate and pre-qualify borrowers and match them with lenders, and explained its function and role in Atmos's business. Atmos made that demonstration because CFB continued to represent that it sought to collaborate with Atmos, not compete using Atmos's technology.

39. The trade-secret technology Atmos disclosed included the nonpublic design, architecture, and implementation of: (a) its standalone installer-management portal and installer onboarding, approval, and management workflow; (b) its decisioning and pre-qualification logic and process diagrams; (c) its CFB-specific

14

lending and integration workflows; and (d) its direct-to-consumer pre-qualification flow.

40. Separately, at deOliveira's request, purportedly for a "business plan" aimed at building a service that would allow CFB to become the "bank of choice for mission-aligned Fintechs," Atmos disclosed nonpublic banking-as-a-service pricing ranges, vendor comparisons and analyses, cost information, and security guidance. That information was confidential and proprietary business information distinct from Atmos's technical platform.

41. The protectable secrets Atmos shared with CFB include Atmos's proprietary installer-management portal, as well as, more broadly, Atmos's nonpublic design, implementation, integration, workflows, and internal materials – the product of substantial investment, technical development, and practical experience – which derive independent economic value from not being generally known or readily ascertainable by competitors.

### E. Defendants Acquired and Used Atmos's Technology Wrongfully

42. The known facts support the reasonable inference that CFB, LaRoe, and deOliveira solicited Atmos's technology and information while misrepresenting the purpose for which they sought it and concealing their intended competitive use. They thereby acquired Atmos's trade secrets by improper means, including misrepresentation, and under circumstances giving rise to a duty to maintain their

15

secrecy and limit their use to the contemplated arrangement. LaRoe personally made and reinforced the representations that induced disclosure; deOliveira defined the technical scope and personally requested and received the materials.

43.    OneEthos used Atmos's technology through deOliveira, the same executive who had solicited and received Atmos's information for CFB. OneEthos and deOliveira knew or had reason to know both that the information had been obtained by misrepresentation and that Atmos had disclosed it in confidence for the contemplated arrangement only. Defendants never sought or received Atmos's consent to use the information to develop, market, or sell a competing offering.

### F. The Evidence of Misappropriation Emerged in 2026

44.    Before 2026, Atmos had no access to the contents, functionality, development history, or origin of the OneEthos offering, and Defendants never disclosed that it incorporated Atmos's technology. In September 2025, at New York Climate Week, CFB's Chief Sustainability Officer stated that nothing like OneEthos's technology offering had existed prior to OneEthos's creation. Neither CFB nor OneEthos revealed the contents of the OneEthos offering or that Defendants had used Atmos's particular trade secrets.

45.    On May 13, 2026, at an industry conference, a prospective Atmos client told Atmos that it had spoken with OneEthos about an installer-management portal offering. That information raised concern, but it did not disclose the portal's design,

functionality, development history, or correspondence to the particular technology Atmos had provided CFB.

46.    On May 22, 2026, Clean Energy Credit Union ("CECU"), an Atmos customer, told Atmos that OneEthos had pitched CECU an installer-management software offering that appeared extremely similar to Atmos's. That information materially heightened Atmos's concern and caused it to investigate further, but Atmos still lacked the details necessary to determine whether the offering embodied Atmos's proprietary design and implementation rather than a different product in the same general category.

47.    Those details gave Atmos, for the first time, the most serious and significant information indicating that Defendants had not merely developed software in the same market, but had taken and were using Atmos's crown-jewel technology, including installer-management functionality materially corresponding to Atmos's standalone portal. Considered together with CFB's proposal to use Atmos rather than build its own program, Defendants' targeted acquisition of Atmos's internal materials, and deOliveira's subsequent leadership of OneEthos, this information supplied the strongest evidence to date of misappropriation.

48.    Knowledge that OneEthos existed, that CFB had been working on technology of some kind, or even that OneEthos had discussed an installer portal in general did not by itself reveal that Defendants had acquired or used Atmos's

17

particular trade secrets. Atmos could not reasonably have discovered the misappropriation earlier and brings this action promptly after obtaining the May 2026 details indicating that Defendants had taken and were using its crown jewels.

## CAUSES OF ACTION

### Count I – Misappropriation of Trade Secrets (Defend Trade Secrets Act, 18 U.S.C. § 1836)
### (Against CFB, OneEthos, deOliveira, and LaRoe)

49.    Atmos repeats and realleges each preceding paragraph as though fully set forth herein.

50.    Atmos's integrated marketplace system – including, but not limited to, its integrated solar-lending platform and the proprietary structure and methods by which it implements that platform, including, but not limited to, the decisioning and pre-qualification logic, the operationalization of two-phase disbursement, the ITC-triggered re-amortization mechanism supporting its proprietary payment structure, the direct-to-consumer pre-qualification flow, and the integration of installer onboarding, approval, and management into loan origination through a proprietary, standalone installer-management portal – is a trade secret related to products and services used in and intended for use in interstate commerce. The protectable secret lies in the integration and implementation of these elements as a functioning system, not in any individual, publicly visible loan term. This information derives

18

independent economic value from not being generally known or readily ascertainable, and Atmos took reasonable measures to keep it secret.

51.    Separately, the installer-management portal – a proprietary piece of software that Atmos designed itself, the use of which is essential to Atmos's offerings – is itself a protectable trade secret.

52.    CFB acquired Atmos's trade secrets through LaRoe's and deOliveira's personal participation in soliciting it for the represented limited purpose of the contemplated arrangement. The acquisition was by improper means, including misrepresentation of the purpose for which the information was sought, and under circumstances giving rise to a duty to maintain its secrecy and limit its use. Atmos expressly communicated that the information was proprietary and confidential and was provided for the contemplated arrangement only; LaRoe and deOliveira knew and acknowledged that limited purpose. OneEthos used the trade secret through deOliveira knowing or having reason to know how it had been acquired.

53.    CFB and OneEthos misappropriated Atmos's trade secrets by using and disclosing them without consent, including by incorporating them into the offering OneEthos markets to the specialized universe of lenders Atmos serves. The offering includes installer-management functionality materially corresponding to Atmos's standalone portal. deOliveira personally participated by soliciting and receiving Atmos's materials for CFB and then leading OneEthos; LaRoe personally

participated in the acquisition by making and reinforcing the representations that induced Atmos to disclose the information. Defendants had no license or authorization to use Atmos's trade secrets for a competing offering. Atmos did not discover, and could not through reasonable diligence have discovered, the misappropriation before the 2026 investigation.

54.    Defendants' misappropriation is continuing and was willful and malicious, including because Defendants obtained the trade secret by false pretenses. Atmos has been damaged, and Defendants unjustly enriched. Atmos requests damages, unjust-enrichment and/or reasonable-royalty recovery, exemplary damages, attorneys' fees, and injunctive relief under 18 U.S.C. § 1836(b)(3).

**Count II – Misappropriation of Trade Secrets (Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001 et seq.)**
**(Against CFB, OneEthos, deOliveira, and LaRoe)**

55.    Atmos repeats and realleges each preceding paragraph as though fully set forth herein.

56.    Atmos's marketplace technology, as described above, is a trade secret under Fla. Stat. § 688.002. CFB acquired that technology through improper means, including fraud and/or misrepresentation, and under circumstances giving rise to a duty to maintain its secrecy and limit its use, through the personal participation of LaRoe and deOliveira. Atmos expressly communicated, and Defendants knew, that the information was proprietary and confidential and could be used only for the

contemplated arrangement. OneEthos used the technology through deOliveira knowing or having reason to know that it had been acquired by improper means and subject to a duty limiting its use.

57.    Atmos protects this information through reasonable measures, as described above, including, but not limited to, by executing non-disclosure and invention-assignment agreements with employees and contractors and setting need-to-know access restrictions on sensitive information.

58.    Atmos did not discover, and could not through the exercise of reasonable diligence have discovered, this misappropriation until 2026.

59.    Atmos requests damages and unjust-enrichment recovery, exemplary damages, attorneys' fees, and injunctive relief under Fla. Stat. §§ 688.003–688.005.

### Count III – Fraud / Fraudulent Inducement
### (Against CFB, deOliveira, and LaRoe)

60.    Atmos repeats and realleges each preceding paragraph as though fully set forth herein.

61.    CFB, deOliveira, and LaRoe made material misrepresentations of fact concerning the purpose of their investing in, and developing a business relationship with, Atmos. Defendant LaRoe represented, on behalf of CFB, that CFB wanted to build its solar-lending program by using Atmos's offering rather than build its own equivalent offering, and that CFB would implement the parties' agreed-upon scope of work, using Atmos's platform to support CFB's lending.

21

62. In addition, on or about March 21, 2022, deOliveira solicited additional confidential information from Atmos while representing that he was working on a "business plan," which he had represented was a plan to develop a program for offering services to financial technology firms like Atmos.

63. deOliveira never disclosed that he or CFB was developing a competing offering to Atmos's. Because they were engaging in a confidential exchange of sensitive business information and trade secrets to facilitate a business partnership, CFB and its executives and Atmos were in a relationship of trust and confidence that made CFB's nondisclosure of relevant facts fraudulent.

64. Because of this context and confidential relationship, CFB's failure to disclose that it was intending to, or even considering, building a competing service to Atmos, was fraudulent. CFB had a duty to make that disclosure, knowing that Atmos had chosen to disclose trade secrets and other confidential business information for the limited purpose of enabling the parties to collaborate.

65. As further detailed above, deOliveira, LaRoe, and CFB's false representations included, but are not limited to:

 a. The representation that CFB planned to "partner with" Atmos and use Atmos's platform, rather than building a competing platform itself;

 b. The MVP, which set forth a proposed business relationship that CFB had no intention of honoring;

c. The representation that CFB was working on a "business plan" for a program to provide services to financial technology companies, rather than a competing financial technology company itself;

d. The representation that CFB would keep confidential trade secrets and other sensitive business information disclosed to it in confidence;

e. The representation that CFB's failure to consummate an agreement with Atmos was the result of federal regulators, rather than because CFB was building a competitor to Atmos and had no intention of partnering with Atmos on the services set forth in deOliveira's MVP; and

f. The representation, in 2025, that OneEthos had built its technology itself because the technology had not previously existed in the marketplace.

66. CFB and its executives' representations were false when made, and deOliveira's nondisclosure of the competing purpose was a material omission, because Defendants intended to obtain Atmos's confidential technology and information for concealed competitive use rather than use it only to evaluate and implement the arrangement they represented. The known sequence, including the targeted solicitation of Atmos's internal implementation materials, deOliveira's later leadership of OneEthos, and the 2026 discovery that OneEthos was pitching Atmos's

23

customer materially corresponding installer-management functionality, supports the inference that Defendants' representations of purpose were false when made.

67.     Defendants deOliveira, CFB, and LaRoe intended that Atmos rely on their false representations, and Atmos justifiably relied on those representations by disclosing its confidential technology and information for the limited purpose Defendants had represented and for the benefit of the parties' partnership. This wrongdoing – deceiving Atmos into entering into a business relationship on the false promise of a collaboration, and then disclosing its technology and information for a sham purpose Defendants did not intend to satisfy – is distinct from the misappropriation itself.

68.     Atmos did not discover, and could not reasonably have discovered, that Defendants' represented purpose concealed competitive use until its 2026 investigation. The most serious and significant information indicating that Defendants had taken and were using Atmos's crown-jewel technology came from CECU's chief executive in May 2026.

69.     As a direct and proximate result of Defendants' fraudulent conduct, Atmos has been damaged, and because Defendants acted with fraud or malice, Atmos requests punitive damages.

**Counts IV–VI (Pleaded in the Alternative to Counts I and II)**

70.    Counts IV through VI are pleaded in the alternative to the trade-secret claims in Counts I and II. To the extent any court determines that some or all of the confidential information and materials Atmos disclosed to Defendants, including, but not limited to, its confidential technology, methods, documents, and process diagrams, and its nonpublic pricing, vendor, cost, and business information, do not satisfy the statutory definition of a trade secret, that information and those materials nonetheless constituted Atmos's confidential and proprietary property, disclosed to Defendants in confidence and for a limited purpose.

**Count IV – Conversion (In the Alternative)**
**(Against CFB, LaRoe, OneEthos, and deOliveira)**

71.    Atmos repeats and realleges paragraphs 1 through 48, and the alternative-pleading allegation in paragraph 70, as though fully set forth herein.

72.    Atmos owned and had the right to control its confidential materials and information, which it delivered to Defendants CFB, deOliveira and LaRoe in confidence and solely for the limited purpose of the parties' contemplated partnership. Defendants wrongfully exercised dominion and control over that property inconsistent with Atmos's rights by taking it and using it beyond the limited purpose for which it was provided and incorporating it into a competing offering, after the premise for the disclosure had failed and without Atmos's authorization, depriving Atmos of its right to control the use of its property.

25

73. Defendant OneEthos benefited from this conversion, as its offering was built on confidential information wrongfully obtained from Atmos.

74. Atmos requests damages in an amount to be proven at trial.

### Count V – Unjust Enrichment (In the Alternative)
### (All Defendants)

75. Atmos repeats and realleges paragraphs 1 through 48 and 71 through 74, and the alternative-pleading allegation in paragraph 70, as though fully set forth herein.

76. Atmos conferred a benefit on Defendants deOliveira, LaRoe, and CFB by disclosing its confidential technology, materials, and information, which Defendants solicited and knowingly accepted and retained. Defendants appreciated that benefit and used it to develop and market a competing offering, OneEthos. The individual Defendants further obtained and retained the benefit of the misappropriation through their respective interests in the competing venture and their participation in the relationship that made it possible. This benefit was only conferred because CFB fraudulently induced Atmos to enter into a relationship with CFB based on, *inter alia*, statements that CFB intended to partner with Atmos along the lines of the MVP proposed by deOliveira, and continuing representations that it still intended to partner with Atmos, even (at times) falsely blaming delays in consummating the parties' partnership on federal regulators.

77.    Allowing Defendants to retain and benefit from this information would be unjust under the circumstances because the information was obtained through fraudulent representations made by deOliveira and LaRoe on behalf of CFB. OneEthos retained and benefited from this confidential information despite knowing that it was obtained under false pretenses, as a result of fraudulent misrepresentations by, among others, OneEthos's CEO deOliveira.

78.    It would be inequitable for Defendants to retain the benefit they obtained from Atmos's confidential technology, materials, and information without paying Atmos its value. Atmos requests restitution and disgorgement of the benefit Defendants unjustly retained.

## Count VI – Common-Law Unfair Competition (In the Alternative) (Against CFB, OneEthos, deOliveira, and LaRoe)

79.    Atmos repeats and realleges paragraphs 1 through 48 and 71 through 78, and the alternative-pleading allegation in paragraph 70, as though fully set forth herein.

80.    Defendants engaged in unfair competition by obtaining Atmos's confidential information and materials under false pretenses, using that information and those materials to build and market a competing offering, and falsely representing to the market that they had independently developed the technology. Defendants' conduct was contrary to honest commercial practice and calculated to

divert to Defendants the specialized universe of customers and prospects that Atmos developed its platform to serve.

81.    As a direct and proximate result, Atmos has suffered damage and Defendants have been unjustly enriched, in an amount to be proven at trial, and Atmos requests damages and injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Atmos respectfully requests judgment against Defendants as follows:

a.  A preliminary and permanent injunction barring Defendants from using, disclosing, marketing, licensing, or selling any product or service incorporating or derived from Atmos's identified trade secrets or confidential information;

b.  Damages for Atmos's actual loss and Defendants' unjust enrichment, or a reasonable royalty, under the DTSA and FUTSA;

c.  Exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and Fla. Stat. § 688.004(2) for willful and malicious misappropriation;

d.  Compensatory and punitive damages on the fraud claim;

e.  In the alternative to Counts I and II, damages for conversion, restitution and disgorgement for unjust enrichment, and damages and injunctive relief for common-law unfair competition;

f.  Attorneys' fees and costs under 18 U.S.C. § 1836(b)(3)(D), Fla. Stat. § 688.005, and as otherwise permitted by law;

g.  Pre- and post-judgment interest; and

h.  Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Atmos demands a trial by jury on all issues so triable.

Dated: July 17, 2026

Respectfully submitted,

/s/ Dean A. Kent
Dean A. Kent
Florida Bar No. 307040
dkent@trenam.com/ ac@trenam.com
**TRENAM LAW**
101 East Kennedy Blvd., Suite 2700
Tampa, Florida 33602-5150
Tel: (813) 223-7474
Fax: (813) 229-6553

Steven J. Pacini, Esq. (*pro hac vice* forthcoming)
Sam A. Barrows, Esq. (*pro hac vice* forthcoming)
PACINI LAW PLLC
5 Bellflower Road Suite #3
Boston, MA 02125
Tel: (617) 600-8454
steve@pacinilaw.com
sam@pacinilaw.com

29

*Attorneys for Plaintiff Atmos Financial, PBC*